**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| ACI/BOLAND, INC., )<br>)<br>  Plaintiff, )<br>)<br>vs. )<br>)<br>U.S. SPECIALTY INSURANCE )<br>COMPANY, )<br>)<br>  Defendant. ) | Case number 4:07cv0378 TCM |

## MEMORANDUM AND ORDER

This insurance dispute is before the Court[1] on the motion of Defendant, U.S. Specialty Insurance Company ("U.S. Specialty"), for summary judgment. [Doc. 57] Also pending is the motion of Plaintiff, ACI/Boland, Inc. ("ACI"), to strike portions of the affidavit of Elliott Gleason submitted by U.S. Specialty in support of its motion. [Doc. 62]

## Background

ACI is a Missouri corporation and an architectural firm. (Compl. ¶ 1.) In 2000, ACI entered an agreement with JCA Support Company ("JCA") "to provide architectural services for the design and construction of a senior residential living community in St. Louis County, Missouri . . . ." ("the Project"). (Id. ¶ 8; Pl. Ex. 24.)

In May 2004, ACI sued JCA to recover unpaid architectural fees in the amount of $177,334,32 allegedly due under that agreement ("the ACI Lawsuit"). (Compl. ¶ 10; Pl. Ex.

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

6.)  Two months later, JCA responded with a two-count counterclaim: one count for breach of contract and one count for negligence, errors, and omissions.  (Pl. Ex. 7; Def. Ex. F[3].) The breach of contract included, but was expressly not limited to: (a) failure to comply with applicable codes and regulations in the design and specifications for a bulk oxygen enclosure; (b) failure to properly estimate the quantity of structural steel required for the Project; and (c) failure to properly design and specify appropriate acoustic treatment in certain portions of the Project.  (Id. at 7-8.)  These were problems that JCA was aware of either before moving into the Project or immediately afterward.  (Delkus Dep., Pl. Ex. 3, at 27.)  The second count alleged that "[i]n preparing the design documents, ACI failed to act with the ordinary and reasonable skill usually exercised by architects and engineers in designing projects of similar nature, size and complexity as the Project" and "ACI also failed to supply the level of professional skill, care and diligence applicable to an architect or engineer possessing the experience and knowledge in the design of elderly care projects of the same general type and nature as the Project which ACI had promised in the Agreement that it would supply."  (Def. Ex. F[3] at 9.)  The second count incorporated by reference the paragraph setting forth the allegations about the bulk oxygen enclosure, the structural steel, and the acoustic treatment.  (Id. at 8.)

On April 25, 2005, ACI and JCA entered into a partial settlement agreement ("the Agreement").  (Pl. Ex. 8; Def. Ex. F[2].)  The Agreement provided, in relevant part, that:

[T]he parties have now agreed:  (i) to resolve only the claims asserted by [ACI] in the [ACI] Petition,[2] excepting [ACI's] claim for interest and costs under the terms of the Design Agreement on the $177,334,32 withheld by JCA . . . ; and (ii) to reserve, preserve, and leave open the claims asserted by JCA in the JCA Counterclaim, and any other claims JCA may have against [ACI] for negligence, errors, omissions or breach of contract in connection with the Design Agreement and/or the Project . . . ; and (iii) reserve preserve and leave open any other claims that [ACI] may have against JCA as a result of any third-party claims brought against [ACI] in connection with the Design Agreement and/or the Project . . . .

(Id. at 1.)  The Agreement further expressly provided that the payment by JCA to ACI of the $1777,334,32 withheld was not "an acknowledgment or agreement on the part of JCA of the JCA Claims, *whether asserted or unasserted, known or unknown, as of the date hereof*," and that the acceptance by ACI of the monies was not a waiver of its interest claim "or of any other claim not specifically waived in th[e] Agreement."  (Id. at 2; emphasis added.)  Both ACI and JCA dismissed "without prejudice" the litigation.  (Id. at 3; emphasis in original).

In April 2006, JCA filed a two-count petition against ACI ("the JCA Lawsuit").  (Pl. Ex. 8; Def. Ex. L.)  As in the counterclaim, one count was for breach of contract and one count was for "negligence, errors, and omissions."  (Id. at 8.)  As before, the second count alleged that "[i]n preparing the design documents, ACI failed to act with the ordinary and reasonable skill usually exercised by architects and engineers in designing projects of similar nature, size and complexity as the Project" and "ACI also failed to supply the level of professional skill, care and diligence applicable to an architect or engineer possessing the experience and knowledge in the design of elderly care projects of the same general type and

_____

[2]Complaints are referred to as "petitions" when filed in Missouri state courts.  See Mo.S.Ct.R. 41.07, 43.01.

- 3 -

nature as the Project which ACI had promised in the Agreement that it would supply." (Id. at 9.) Incorporated in both counts were (a) allegations first made in the counterclaim about the bulk oxygen enclosure, the structural steel, and the acoustic treatment and (b) six new allegations. (Id. at 4-5.) These new allegations included a failure to properly design and/or specify (i) the HVAC [heating, venting, air-conditioning] system; (ii) the hot water recirculation system; (iii) the retaining walls; (iv) the large berm on the southwest boundary of the Project; (v) the resident room bathrooms; and (vi) the storm water drainage system. (Id. at 6-7.) The JCA had become aware of the problems with the HVAC system by the winter of 2003, with the retaining walls and southwest berm by spring of 2004, with the residents's bathrooms by fall of 2003, and with the storm water drainage system prior to moving into the Project. (Delkus Dep., Pl. Ex. 3, at 28-31.)

In October 2006, JCA filed a first amended petition, naming as two additional defendants the construction company, S.M. Wilson & Company ("Wilson"), and one of its subcontractors, Charles E. Jarrell Contracting Company, Inc. (Pl. Ex. 10.) JCA also added three new allegations of "errors, omissions, defects and . . . negligence": a sinking patio; an inoperable dimmer system for lighting; and an improperly functioning engineered smoke control system (Id. at 8-9.) The list of all twelve allegations was expressly described as not being all-inclusive, e.g., "[s]uch errors, omissions, defects and other negligence include, but are not limited to . . . ." (Id. at 7.) A count for breach of contract and a count for "negligence, errors, and omissions" were added against Wilson and separately against the subcontractor. (Id. at 11-16.)

A second amended petition was filed in May 2007, describing with greater specificity the allegations about the HVAC system and the hot water recirculation system and increasing the estimated amount of damages.  (Pl. Ex. 11 at 7-8.)

In January 2008, JCA sought leave to file a third amended petition to (a) assert direct claims against another subcontractor of Wilson, (b) add allegations of inoperable dishwashers, (c) remove allegations about the smoke alarm system, and (d) include additional allegations about deficiencies in the HVAC system.  (Pl. Ex. 12.)  This motion was granted.  (JCA Support Co. v. ACI-Boland, Inc., No. 2106CC-01674 (Mo. Cir. Ct. Feb. 1, 2008) (https://www.courts.mo.gov/casenet/cases/searchDockets.do) (last visited Jan. 12, 2009)).  In July, JCA dismissed all claims against ACI and Wilson.  (Id.)  Other claims and cross-claims remain pending.  (Id.)

When the ACI Lawsuit was filed, ACI had a claims made and reported professional liability insurance policy through Great American Assurance Company ("Great American") for the period from April 1, 2004, to April 1, 2005.  (Gleason Aff., Def. Ex. H, at [3]; Gleason Aff., Def. Ex. G, ¶¶ 5, 7-8.)  Great American was first notified of "any claim of any nature" by JCA against ACI in September 2006.  (Id. ¶ 12.)  It denied coverage in November 2006 on the grounds that notice of JCA's counterclaim had not been provided within the policy period.  (Id. ¶ 13.)

When the JCA Lawsuit was first filed, ACI had a claims made and reported professional liability insurance policy through U.S. Specialty.  On February 3, 2005, ACI had applied to U.S. Speciality for a claims made and reported professional liability insurance

policy.  (Bechter Aff., Def. Ex. C, ¶ 7; Aff. Ex. 1.)  Michael G. Kautz, an ACI principal, completed the application and answered "No" to questions if "the firm or any of its members ha[d] any knowledge or prior acts, errors or omissions which might reasonably be expected to give rise to a claim under th[e] [policy]", if "the firm ha[d] any pending dispute concerning the payment of fees to the firm for services rendered," and if "the firm or any of its members ha[d] any knowledge of any circumstance, incident, situation, accident condition or unresolved job controversy or other matter which might give rise to a claim under the insurance."  (Aff. Ex. 1 at 5.)  He answered "Yes" to the question whether any professional liability claims had been made against the firm or its members and attached a list of four jobs, not including JCA, and to whether notice had been given to any professional liability underwriter "of any actual or alleged act, error, omission, deficiency, . . . circumstance, incident, situation, . . . or fee dispute which could result in a claim."  (Id. at 5, 7[A].)  Although Mr. Kautz signed the application, he had not completed it, nor had he reviewed or read it.  (Kautz Dep., Def. Ex. D, at 47, 51.)  Mr. Kautz testified in his deposition at one point that he was not aware that JCA's counterclaim was still pending when he signed the application; he testified a short time later that he was so aware.  (Id. at 50, 53.)

Subsequently, U.S. Speciality issued ACI a claims made and reported professional liability insurance policy for the period from April 1, 2005, to April 1, 2006.  (Def. Ex. J.)

Douglas Boyd, a principal of ACI, completed a new application for a claims made and reported policy on March 14, 2006.  (Bechter Aff., Def. Ex. C, Aff. Ex. 2 at 7.)  His answers were the same as given the year earlier by Mr. Kautz, with the exception that three pending

claims were listed. (Id. at 5, 7[A].) Again, the JCA project was not listed. (Id. at 7[A].) U.S. Speciality then issued ACI another claims made and reported professional liability insurance policy for the period from April 1, 2006, to April 1, 2007 ("the Policy"). (Pl. Ex. 17; Def. Ex. K.) Expressly excluded from coverage were any claims arising from listed projects; the JCA Project was not included. (Id. at [3].) Another provision read:

> WE will cover YOU for any liability which YOU assume under any contracts or agreements for professional services, whether written or oral, to any and all persons or organizations with whom YOU so contract or agree to the extent that such liability arises from YOUR negligent act, error or omission in the performance of YOUR professional services.

(Id.) A separate limitation read:

> In consideration of the premium paid, it is understood and agreed that the coverage provided by this policy shall not apply to CLAIMS arising from or based upon YOUR negligent acts, errors or omissions prior to the POLICY PERIOD or prior to the PRIOR ACTS RETROACTIVE DATE stated upon the DECLARATIONS page, whichever is earlier. WE will neither defend nor indemnify YOU for such claims.

(Id. at [4].) Included in the definitions of "claim" were:

> A demand or request of YOU, whether in writing or orally, for DAMAGES or services alleging YOUR negligent act, error or omission in the performance of YOUR professional services.

> An allegation by another person of YOUR negligent act, error or omission in the performance of YOUR professional services.

(Id. at [15].) "Companion claims" were defined as "related CLAIM or CLAIMS that have arisen or may arise out of the same or replicated alleged negligent act, error, or omission in the performance of YOUR professional services." (Id.) Coverage for professional liability was defined as: "WE will pay DAMAGES and CLAIM EXPENSES in excess of YOUR

- 7 -

Deductible, subject to all other provisions of this policy, that YOU become legally obligated to pay because of CLAIMS that arise from YOUR negligent act, error, or omission in the performance of YOUR professional services . . . ." (<u>Id.</u> at [17].) Under the heading, in bold and capital letters, "**YOUR CLAIMS MADE AND REPORTED COVERAGE**," the Policy included the following provisions for claims for services performed prior to the Policy period:

> YOU are covered, subject to all other provisions of this policy, for a CLAIM of which WE receive written notice during this POLICY PERIOD . . . provided that:
>
> 1. Prior to this POLICY PERIOD YOU had no knowledge of the CLAIM, circumstance, dispute, situation or incident that could reasonably be expected to give rise to the CLAIM, and
>
> 2. YOUR actual or alleged negligent act, error, or omission upon which the CLAIM is based took place subsequent to the Prior Acts Retroactive Date specified in the Declarations but prior to the Effective Date of this policy, and
>
> 3. There is no other valid and collectible insurance available to YOU for YOUR actual or alleged negligent act, error, or omission that took place as specified in 2., above.

(<u>Id.</u> at [18]-[19].) Although there was generally coverage for "companion claims," U.S. Speciality would not defend or pay damages or claims expenses on ACI's behalf "if the alleged negligent act, error or omission upon which the COMPANION CLAIM is based was known to [ACI] prior to the Effective Date of this policy." (<u>Id.</u> at [19].) Also excluded was "any liability for any CLAIM that arises out of or is related to [ACI's] performance of professional services where, prior to the inception date of this policy, [ACI] [was] aware of a CLAIM, circumstance, dispute, situation or incident that had given rise to or could

- 8 -

reasonably be expected to give rise in the future to a CLAIM or CLAIMS against [ACI], whether or not [ACI] reported the CLAIM, circumstance, dispute, situation, or incident to [U.S. Specialty] on [ACI's] initial application for insurance." (Id. at [23].) This is Exclusion 10.

A copy of the JCA Lawsuit was sent to U.S. Speciality on May 4, 2006. (Pl. Ex. 18; Def. Ex. M.) The cover letter listed a date of loss of April 27, 2006. (Id.) By letter of June 30, an attorney for U.S. Speciality informed Mr. Boyd that U.S. Speciality was denying coverage on the grounds that "the current allegations of errors and omissions were initially raised during the [ACI Lawsuit] between June of 2004 and April of 2005. Accordingly, . . . ACI clearly had knowledge of this 'claim, circumstance, dispute, situation or incident that could reasonably be expected to give rise to the claim' prior to the inception of [the] policy[.]" (Id.) This position was reaffirmed by letter of November 20, 2006, to ACI's counsel and by letter of November 28, 2006, to Mr. Boyd. (Def. Exs. O, P.)

During the relevant time period, Mr. Boyd would secure professional liability insurance by requesting that a broker seek proposals from various companies. (Boyd Dep., Def. Ex. B, at 44-45.) To give those companies a history that was as accurate as possible, he would contact the other ACI principals and inquire about any potential claims. (Id. at 45-46, 48.) ACI's insurance broker discusses the need for complete disclosure every year. (Id. at 47.) In turn, Mr. Boyd discusses this need with the other principals every year. (Id. at 49.)

Also, the general policy at ACI was that the principal in charge of the project was responsible for notifying its insurance company or broker of a claim against ACI. (Kautz Dep., Def. Ex. D, at 27-28, 32.) Mr. Kautz, who signed the first application for insurance with U.S. Specialty, and Mr. Boyd, who completed and signed the second application, both testified that Mr. Boland was the principal in charge of the litigation between ACI and JCA. (Kautz Dep., Def. Ex. D, at 26, 35; Boyd Dep., Def. Ex. B, at 103.) According to Mr. Kautz, it was therefore Mr. Boland's responsibility to send JCA's counterclaim to ACI's broker. (Kautz Dep., Def. Ex. D, at 36.) Mr. Kautz assumed that Mr. Boland had done so. (Id.) Although Mr. Boyd could not specifically recall whether it had been done, he testified in his deposition that the JCA counterclaim should have been sent to ACI's broker to be reported to ACI's insurer. (Id. at 50, 51-52.) He would consider a failure to do so as a mistake. (Id. at 52-53.)

On the other hand, Mr. Boland testified in his deposition that he was a paid employee at the time of the counterclaim, thus it was not his responsibility to notify ACI's broker of the counterclaim. (Boland Dep., Def. Ex. E, at 25, 27, 177.) It was his responsibility to notify the principal in charge of the project, Paul Sabal, which he did. (Id. at 25-26, 28, 41, 47, 177.) Had it been his responsibility, however, he would not have reported the counterclaim to ACI's insurer because he considered it to be a negotiating tool in a long-standing dispute over unpaid fees. (Id. at 26-27, 46-48, 182; Boland Dep., Pl. Ex. 1, at 182.) He understood that the Agreement allowed JCA to refile their counterclaims against ACI or any new claims relating to their contract with ACI for the Project. (Id. at 61, 163.) Mr.

Boland testified in his deposition that Mr. Sabal was aware of the Agreement. (Id. at 61.)

He further testified that Mr. Boyd never asked him if there were any lawsuits pending against

ACI. (Boland Dep., Def. Ex. E, at 39-40.)

As of January 7, 2004, Mr. Boland was aware that JCA was having problems with the

Project's HVAC system. (Boland Dep., Def. Ex. T, at 72; Boland Dep., Pl. Ex. 1, at 77.)

He testified in his deposition that ACI was aware of problems with the retaining walls at least

by April 2003. (Def. Ex. T at 111.) He could not recall if he was so aware. (Id.) He

perceived the problems to be the responsibility of the contractor. (Boland Dep., Pl. Ex. 1,

at 96-97, 109, 115, 121, 157.) Of the six new allegations in the JCA Lawsuit, Mr. Boland

was previously aware of all but the ones concerning the residents's bathrooms and the

particular berm cited. (Id. at 166-68.)

Paul Garlack, an ACI project manager for the Project, was the "go-between" between

Mr. Boland and JCA for design issues relating to the Project. (Boland Dep., Def. Ex. T, at

129.) Mr. Garlack testified that he informed Mr. Boland of JCA's complaints about the

acoustics and the bulk oxygen enclosure promptly upon learning of them. (Garlack Dep.,

Pl. Ex. 4, at 31, 61.) When he learned of the allegations about the HVAC system, the

resident room bathrooms, the retaining walls, the storm water drainage system, the acoustic

treatment, and southwest berm, he informed Mr. Boland of them. (Id. at 79, 84.)

In April 2006, JCA faxed Mr. Boland and Scott Wilson, the president of Wilson, a

letter outlining problems with the Project's HVAC system, hot water return system, retaining

walls, southwest berm, resident room bathrooms, and site drainage and renewing its three

claims against ACI originally asserted in its counterclaims in the ACI Lawsuit. (Pl. Ex. 22.) U.S. Specialty was first notified of JCA's claims relating to the Project, including its 2004 counterclaim, in April 2006. (Def. Ex. I.)

In this action, ACI seeks a judgment that there is coverage under its Policy with U.S. Specialty for JCA's Project allegations, monetary relief for damages it has sustained as a consequence of U.S. Specialty denying coverage, and attorney's fees and statutory penalties for U.S. Specialty's vexatious refusal to provide that coverage. In response to U.S. Specialty's motion for summary judgment on the grounds that the Policy clearly excludes coverage for JCA's claims because ACI had prior knowledge of them, ACI argues that there is coverage because the Policy provides for such when it had no knowledge of *the* claim, circumstance, or dispute. It could not have had such prior knowledge because the policy defines claim as something the insured first becomes aware of during the policy period. ACI further argues that Exclusion 10, which does not require a direct relationship between *the* claim and ACI's prior knowledge, is inconsistent with the policy's Prior Service Coverage and Declaration, which does require such a relationship, and is therefore not enforceable. U.S. Specialty counters the plain language of the Policy and ACI's prior knowledge of JCA's counterclaim precludes coverage.

## Discussion

"Rule 56(c) [of the Federal Rules of Civil Procedure] 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" **Erenberg v. Methodist Hosp.**, 357 F.3d 787, 791 (8th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). When ruling on a motion for summary judgment, "[t]he court must simply determine whether there exists a genuine issue for trial, i.e., whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in her favor." **Buboltz v. Residential Advantages, Inc.**, 523 F.3d 864, 870-71 (8th Cir. 2008). "The court must not weigh evidence or make credibility determinations, as those are functions for the jury." **Id.** Moreover, the facts must be viewed in the light most favorable to the nonmoving party and that party must be given the benefit of all reasonable inferences that can be drawn from the facts. **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574, 587 (1986). "Where, as here, the [pending] issues are primarily legal, rather than factual, summary judgment is particularly appropriate." **Jankovitz v. Des Moines Indep. Comty. Sch. Dist.**, 421 F.3d 649, 653 (8th Cir. 2005).

In the instant case, Missouri law is applicable, see **J.E. Jones Const. Co. v. Chubb & Sons, Inc.**, 486 F.3d 337, 340 (8th Cir. 2007); **Capitol Indemn. Corp. v. 1405 Assocs., Inc.**, 340 F.3d 547, 549 (8th Cir. 2003); and holds that an insurance policy is a contract and is governed by the rules of contract construction, see **Leonards v. Southern Farm Bureau**

**Cas. Ins. Co.**, 279 F.3d 611, 613 (8th Cir. 2002); **Blair v. Perry County Mut. Ins. Co.**, 118 S.W.3d 605, 606 (Mo. 2003) (en banc). "Missouri courts interpret insurance policies according to their plain meaning, giving words the meaning that would ordinarily be understood by a lay person who purchased the policy." **J.E. Jones Const. Co.**, 486 F.3d at 341; accord **Farmland Indus., Inc. v. Republic Ins. Co.**, 941 S.W.2d 505, 508 (Mo. 1997) (en banc). "[A] court should not search for an ambiguity where there is none." **Am. Econ. Ins. Co. v. Jackson**, 476 F.3d 620, 624 (8th Cir. 2007) (internal quotations omitted). "If there is any ambiguity in the policy, it inures to the benefit of the insured, not the insurer." **Machea Transport Co. v. Philadelphia Indem. Co.**, 463 F.3d 827, 832 (8th Cir. 2006). "Mere disagreement by the parties[, however,] regarding a contract term's interpretation does not render the term ambiguous." **Lindsay v. Safeco Ins. Co.**, 447 F.3d 615, 617 (8th Cir. 2006). Additionally, "[t]he provisions of an insurance policy are read in the context of the policy as a whole." **Am. Econ. Ins. Co.**, 476 F.3d at 624 (internal quotations omitted). Thus, "construction or interpretation of an insurance policy which entirely neutralizes one provision should not be adopted if the contract is susceptible [to] another construction which gives effect to all its provisions and is consistent with the general intent." **Murray v. Am. Family Mut. Ins. Co.**, 429 F.3d 757, 766 (8th Cir. 2005) (internal quotations omitted). See also **Seeck v. Geico Gen. Ins. Co.**, 212 S.W.3d 129, 134 (Mo. 2007) (en banc) ("Where . . . an other insurance clause appears to provide coverage but other clauses indicate that such coverage is not provided, then the policy is ambiguous, and the ambiguity will be resolved in favor of coverage for the insured.").

As noted above, the policy at issue is a "claims made" policy. "[C]laims made policies are generally triggered by the date the claim is made upon the insured."[3] **Wittner, Poger, Rosenblum & Spewak, P.C. v. Bar Plan Mut. Ins. Co.**, 969 S.W.2d 749, 752 (Mo. 1998) (en banc). "[A] claims made policy provides coverage when the act or omission is discovered and brought to the attention of the insurer, regardless of when the act or omission occurred. Because the reporting requirement helps define the scope of coverage under a claims made policy, to excuse a delay in notice beyond the policy period would alter a basic term of the insurance policy." **Id.** at 754 (internal quotations omitted); accord **Continental Cas. Co. v. Maxwell**, 799 S.W.2d 882, 886 (Mo. Ct. App. 1990). Thus, with a claims made policy, "if there is no timely notice, there is no coverage." **Lexington Ins. Co. v. St. Louis Univ.**, 88 F.3d 632, 634 (8th Cir. 1996) (noting that Missouri cases emphasize the necessity of this timely notice).

As in **Wittner**, three dates are relevant to whether there is coverage under the Policy for the JCA Lawsuit: "the date of the act or omission; the date claim is made against the insured; and the date the insured reports the claim to the carrier." 969 S.W.2d at 752. It is undisputed that the act or omission arose from ACI's work on the Project, which was clearly finished by the time ACI filed its lawsuit in May 2004 to recover withheld fees. It is also undisputed that ACI did not report JCA's counterclaim to U.S. Specialty until April 2006.

---

[3]"By contrast, 'occurrence' policies 'generally provide coverage for an event that occurs during the policy period, regardless of when a claim is asserted.'" **H & R Block, Inc. v. Am. Int'l Specialty Lines Ins. Co.**, 546 F.3d 937, 939 (8th Cir. 2008) (quoting Wittner, 969 S.W.2d at 752).

Only the second date is in dispute, and this dispute centers on the meaning of "claim." For the reasons set forth below, the Court finds that the unambiguous terms of the Policy excludes coverage for JCA's claims against ACI for alleged deficiencies in its professional services for the Project.

"In consideration of the premium paid," the Policy expressly excludes coverage for "claim*s*" based on "negligent acts, errors or omissions" prior to the Policy period. (Pl. Ex. 17 at [3]; Def. Ex. K at [3]; emphasis added.) This exclusion reflects the principle that "[b]y limiting coverage to claims made and reported during the policy term, a claims made policy 'allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty.'" **H & R Block, Inc.**, 546 F.3d at 942 (quoting FDIC v. St. Paul Fire and Marine Ins. Co., 993 F.2d 155, 158 (8th Cir. 1993)). "Such a policy reduces the potential exposure of the insured, thus reducing the policy cost to the insured." **FDIC**, 993 F.2d at 158.

Consistent with the principle that "the very purpose of insurance is to protect against the risk of unknown but not unexpected loss," **H & R Block, Inc.**, 546 F.3d at 941, a claim for prior acts first reported during a policy period must not have been known prior to that period. See **Wittner**, 969 S.W.2d at 753; **City of Brentwood, Mo. v. Northland Ins. Co.**, 397 F.Supp.2d 1143, 1147 (E.D. Mo. 2005); **FDIC**, 993 F.2d at 158. "Claim" is defined in the Policy as a demand or request based on ACI's "negligent act, error or omission in the performance" of its professional services or an allegation of such a "negligent act, error or omission." (Pl. Ex. 17 at [15]; Def. Ex. K at [15].) To be covered for a claim for services

performed prior to the policy period, ACI had to have "had no knowledge of the CLAIM, circumstance, dispute, situation or incident." (Id.) In January 2000, ACI and JCA entered into an agreement for design services of the Project. In May 2004, ACI sued JCA for unpaid fees. In July, JCA counterclaimed for "negligence, errors, and omissions," describing three such problems and expressly stating that the three were not the entire list. ACI did not notify its insurer of this counterclaim, which was dismissed in April 2005 *without prejudice* to JCA reasserting the three problems and any others relating to ACI's performance on the Project. In April 2006, JCA filed suit against ACI, reasserting the three earlier-cited problems and adding six others. ACI notified its insurer, U.S. Speciality, of this lawsuit.

Clearly, ACI had knowledge in 2004 that JCA alleged it had been negligent in its performance of design services on the Project. ACI argues that it considered such allegations to be resolved because the counterclaim was dismissed. This argument is unavailing for three reasons. First, the dismissal of the counterclaim was not the reason why ACI did not report JCA's allegations to its insurer at the time. There was a nine-month period while the counterclaim was pending during which it was not reported to ACI's then-insurer. Mr. Boland testified that he would not have reported it because he considered the counterclaim to be a negotiating tool and without merit. See **Wittner**, 969 S.W.2d at 751, 753, 754 (insured was not relieved of obligation to report former client's claim because he subjectively believed that (a) client, who had earlier informed insured that she had an appointment with another attorney to discuss malpractice action after a default divorce decree had been entered

against her, did not suffer any damages[4] and (b) matter would be worked out and that client would never file claim); accord **City of Brentwood, Mo.**, 397 F.Supp.2d at 1148 (subjective belief of insured about value of claim does not negate duty to report such). He also testified that he was never asked about any lawsuit pending against ACI. Mr. Boyd testified that such counterclaim should have been reported to ACI's insurer. He further testified that the principals in charge of the various projects were responsible for reporting potential professional liability insurance claims. As to the Project there is conflicting evidence about who that principal was. There is no evidence, however, that the counterclaim was not reported because ACI had no knowledge that JCA was alleging the existence of acts that fell within its professional liability insurance coverage.

Second, the counterclaim was dismissed without prejudice in a detailed partial settlement agreement. That Agreement expressly provided that the claims by JCA about ACI's performance on the Project were "reserve[d], preserve[d], and [left] open." (Pl. Ex. 8.) If, as Mr. Boland thought, the counterclaim was a negotiating tool, JCA's agreement to pay ACI the full amount sought in the ACI Lawsuit was nonsensical. Moreover, Mr. Boland

---

[4]Another legal malpractice claim under a "claims made" policy was at issue in the case of **General Acc. Ins. Co. of Am. v. Trefts**, 657 F.Supp. 164 (E.D. Mo. 1987). There, the court held that a possible communication of a desire to correct a default and foreclosure in other litigation in which an insured had represented the claimant did not give "knowledge of a potential malpractice claim" against the insured. **Id.** at 167. "The relevant evidence [did] not clearly reflect dissatisfaction with [the insured's] services, so much as dissatisfaction with the result obtained." **Id.** Thus, the forwarding to the insurer of a letter written three years later informing the insured of "potential legal malpractice claims" against him provided the insurer of timely notice of claims made. **Id.** In the instant case, JCA's dissatisfaction with ACI's *services* was first communicated in July 2004.

and/or ACI was aware of two of the three alleged deficiencies prior to ACI filing its lawsuit. And, the dismissal of the counterclaim without prejudice is not the cause for it not being reported for the nine months it was pending.

Third, the Policy does not equate "claim" with "lawsuit." Under Missouri law, "coverage under a claims made policy is triggered when a claim is first made, but not every time a claim is made." **Northern v. Physicians Defense Ass'n**, 88 S.W.3d 130, 135 (Mo. Ct. App. 2002). In **Northern**, a physician and clinic were sued for malpractice and promptly notified their claims made professional liability insurer of the suit. **Id.** at 131. Six months later, they cancelled their policy with the first insurer and obtained a similar policy with another insurer. **Id.** While insured with this second insurer, the malpractice suit was dismissed without prejudice and was refiled a month later. **Id.** The physician and clinic notified both insurers of the second lawsuit. **Id.** Both denied coverage, the first on the theory that the original claim had been dismissed and the second suit had been filed after the policy had been cancelled, the second insurer on the theory that the claims had first been made before their policy became effective. **Id.** at 133-34. The court of appeals held that, under Missouri law, the first insurer remained liable for coverage for the new lawsuit because the claim had originally been made when its policy was in effective.[5] **Id.** at 134-35. Conversely, the second insurer was not liable because the claim was not first made during

---

[5]ACI moves to strike portions of Gleason's affidavit stating that JCA's claims would have been covered under ACI's professional liability insurance policy with Great American had they been timely reported. The question before the Court is whether those claims are covered under ACI's policy with U.S. Specialty. The Court will disregard, but not strike, the contested portions.

its policy period. **Id.** at 135. Thus, the dismissal without prejudice of the first lawsuit did not control the question of when the claim was first made.

ACI further argues that the Policy's use of "a" and "the" before "claim" is ambiguous. ACI would have the Court isolate the word "claim" from its surrounding words in the Policy and focus on the times when "claim" is preceded by "the," e.g., in the numbered provisions for coverage for services provided prior to the policy period, and when by "a," e.g., in the introductory paragraph preceding the numbered provisions. "Policy language is ambiguous if it is reasonably open to different constructions and the language used will be viewed in the meaning that would ordinarily be understood by the layman who bought and paid for the policy." **Farmers Ins. Co. v. Pierrousakos**, 255 F.3d 639, 642 (8th Cir. 2001) (internal quotations omitted). Mr. Boyd is the ACI principal responsible for securing professional liability insurance. His understanding of such insurance was that the counterclaim should have been reported. There is no evidence that it was any one's understanding at ACI that the counterclaim need not be reported because it was not a claim for negligent acts, errors, or omissions. In **City of Brentwood**, the court described as a "red herring" an ambiguity argument that the policies' use of "claim" in conjunction with "suit" meant that a "claim" was not made until a lawsuit was filed. 397 F.Supp.2d at 1147. "[E]ven if a reasonable policyholder could have thought a lawsuit had to be filed for a 'claim' to arise, the suit would

be precluded because a lawsuit was certainly foreseeable before either policy was issued."
**Id.**[6]

A third argument of ACI undermines rather than supports its position. ACI contends that the addition of the six new alleged errors in the JCA Lawsuit followed by three other errors in a first amended petition and later by the deletion of one error and the addition of another in a third amended petition require that U.S. Speciality provide coverage for at least these new allegations. Had ACI's professional liability insurer been given notice in 2004 of JCA's counterclaim, all allegations of negligent acts, errors, and omissions by ACI with respect to the Project could have been then resolved. ACI's failure to do so "denied [the insurer] [the] opportunity to manage and attempt to reach an early and inexpensive resolution of [the] claim[s]. A claim that obviously soured over time." **Wittner**, 969 S.W.2d at 755. ACI's interpretation of the reporting requirement would have a "claims made" insurer be at risk for covering prior acts any time a claimant amended allegations of a deficient performance, regardless of when the insured was first notified that its performance was considered to be deficient. Under this theory, ACI would be covered by its claims made

---

[6]The District Court for the District of Kansas applied Missouri law to a similar factual dispute in **Civil Assocs., Inc. v. Security Ins. Co.**, 749 F.Supp. 1076 (D. Kan. 1990). In that case, an architectural firm was owed money by a client. In discussions about the collection of the fees, the client informed the firm that it was concerned about the firm's inability to timely and satisfactorily complete its projects. **Id.** at 1078. The firm did not consider this concern to be a claim or potential claim, but a negotiating tool to avoid paying the firm's fees. **Id.** Consequently, the firm did not notify its claims made professional liability insurer of the client's allegations. **Id.** After that policy expired, the firm's president learned that the client intended to assert a claim against the firm for negligent performance of professional services. **Id.** He notified his current insurer; coverage was denied on the grounds that of untimely notice. **Id.** Without discussion, the court held the insurance policy was not ambiguous or inconsistent when using "claims" and "claims made." **Id.** at 1080.

professional liability insurer for the period including January 2008 because that was when the JCA first added allegations of inoperable dishwashers, although the suit had then been pending for twenty months.  As noted above, "coverage under a claims made policy is triggered when a claim is first made, but not every time a claim is made."  **Northern**, 88 S.W.3d at 135.  Additionally, this open-ended interpretation of when notice has to be given would defeat the principle behind a claims made policy of "allow[ing] the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty." **H & R Block, Inc.**, 546 F.3d at 942 (internal quotations omitted).

## Conclusion

"Under Missouri law, the claimant has the burden to show that the policy covers the loss." **J.E. Jones Const. Co.**, 486 F.3d at 340.  For the reasons set forth above, ACI has failed to show that its Policy with U.S. Speciality covers JCA's claims against it relating to the Project.  Accordingly,

**IT IS HEREBY ORDERED** that the motion of U.S. Speciality Insurance Company for summary judgment is **GRANTED** [Doc. 57] and that the motion of ACI/Boland, Inc., to strike portions of the affidavit of Elliott Gleason is **DENIED** as moot.  [Doc. 62]

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of January, 2009.